**OLATHE MILLWORK COMPANY and Cobblestone Construction Finishes, Inc., Plaintiffs,**

v.

**Bob DULIN, et al., Appellants,**

**H. Kent Desselle and Shirley Desselle, Respondents.**

**No. WD 64817.**

Missouri Court of Appeals, Western District.

April 25, 2006.

Ronald K. Barker, Lee's Summit, for Appellant.

Robert L. Desselle, Independence, for Respondent.

Before JOSEPH M. ELLIS, Presiding Judge, THOMAS H. NEWTON, Judge and PAUL M. SPINDEN, Judge.

JOSEPH M. ELLIS, Judge.

Respondents H. Kent Desselle and his wife Shirley M. Desselle ("the Desselles") filed an action for breach of contract against Appellant Bob Dulin ("Dulin"), d/b/a Bob Dulin Homes and Bob Dulin Trucking, in the Circuit Court of Jackson County. Dulin answered the petition and brought counterclaims against the Desselles seeking damages arising out of Dulin's construction of a new home for the Desselles on several alternative theories, including indemnification (Count I), breach of contract (Count II), action on an open account (Count III), and *quantum meruit* (Count IV). After a bench trial, the circuit court awarded Dulin damages on some of his breach of contract claims and some of his indemnification claims, but denied him recovery on his claims for action on an open account and *quantum meruit*. The court also entered judgment in favor of the Desselles on some of their breach of contract claims against Dulin. Dulin now brings this appeal. We reverse and remand for further proceedings.

As found by the trial court, which issued specific findings of fact and conclusions of law as requested by the Desselles before trial, the facts of the case are as follows. Dulin is engaged in the business of residential home building as a general contractor, and his principal place of business is located in Lee's Summit, Missouri. The Desselles live at Lot 35, Block R Lake Shore Drive, Lake Lotawana, Jackson County, Missouri. Their original home was destroyed by fire on February 7, 2001, and the residence was deemed a total loss by their homeowner's insurance carrier, State Farm Insurance Company. After the fire, all that remained of the Desselles' original home was a partial wall or two, some decking, and a fireplace, as well as a portion of the original home's concrete foundation, some underground utility lines, and an asphalt driveway. After these remnants were demolished and the resulting debris was hauled away by Dulin, a new house was built from the ground up, including a new basement floor and several new additions to the original foundation.

On or about June 12, 2001, the Desselles and Dulin entered into a "Construction Contract" for the construction of a new home on the same lot as the original house. The contract provided that Dulin was to "furnish all labor, materials and equipment required for erection and completion" of the home. Although several different sets of blueprints for the Desselles' new home were prepared and submitted to Dulin over the months that followed, no architect's or engineer's specifications corresponding to those blueprints were ever submitted to Dulin. Instead, the document that served as the "specifications" for the building project was an itemized

breakdown of allowances prepared by State Farm. This document, which was dated February 23, 2001, and was prepared by State Farm with the understanding that the new house would be substantially similar to the one that had burned down, set a maximum dollar allowance for each of the types or categories of rebuilding expenses State Farm had agreed to pay under the terms of its insurance contract with the Desselles.

The total allowance from State Farm for rebuilding substantially the same house as the one which was destroyed by fire was $266,269.05. This allowance formed the basis for the June 12, 2001 "Construction Contract" entered into by the Desselles and Dulin. As stated in the contract, the price for building the new house was "apt. $270,000," which both parties agreed was shorthand for "approximately $270,000."

The contract contained two provisions for increasing the price of the new home from the "approximate" figure of $270,000, which were as follows: "Said purchase price shall be increased by an amount equal to the sum of the following: (i) The net increase in cost resulting from change orders. (ii) The amounts spent by [Dulin] on items for which allowances have been made in excess of the amount of the allowances set forth in the Specifications attached."

After Dulin began building the new house, the Desselles requested, by written change order, that certain specified additional work be performed. In particular, the Desselles requested the construction of: (1) a subfloor in the attic and an enclosure for the furnace in an upstairs storage area, for the additional cost of $5,000; and (2) a seawall and additional rough-in for the additional cost of $15,000.[1] No other written change orders were made.

Although the new house was built on a new foundation with a footprint similar to that of the old one, the interior square footage of the new home was greater than that of the house which had burned down. Moreover, the new house included many upgrades and improvements as compared to the old house that had burned down.

As the construction project proceeded, various disputes arose and the Desselles began withholding all or part of certain interim progress payments to Dulin. Dulin later brought suit against the Desselles, seeking to receive a judgment for money he claimed was owed to him and his subcontractors and material suppliers by the Desselles for the work that had been done on the home, as well as various upgrades in the quantity and quality of the different building materials used to construct it.

The trial court ruled that there was a binding and complete express contract by and between Dulin and the Desselles at the time Dulin began building a new home for the Desselles. Accordingly, it viewed all of the evidence presented at trial through the lens of that contract. In particular, the trial court required Dulin to prove, as a prerequisite to recovery of any sum above and beyond the contract price of "apt. $270,000," that the construction expenses he actually incurred in building the Desselles' new home were either (1) the subject of a written change order; or (2) in excess of the maximum dollar allowances set forth in State Farm's itemized breakdown for each of the types or categories of rebuilding expenses State Farm had agreed to pay under the terms of its

---

1. Neither the seawall nor the additional rough-in resulted in additional direct costs to Dulin because the Desselles themselves paid the persons who performed that work. However, construction of the seawall did necessitate that Dulin perform certain hauling work which was not included in the itemized breakdown of allowances prepared by State Farm.

insurance contract with the Desselles. Applying this standard to the amounts billed by Dulin and every subcontractor used by Dulin over the course of the entire construction project, the trial court allowed Dulin to recover from the Desselles some of the construction expenses Dulin had incurred as the general contractor, while disallowing others and holding Dulin solely responsible for them. Ultimately, the court awarded Dulin $29,533.14 on his breach of contract claims against the Desselles and awarded the Desselles $16,557.24 on their breach of contract claims against Dulin, resulting in a net judgment in favor of Dulin against the Desselles of $12,975.90.

■ This leads us to Dulin's first point relied on,[2] in which he argues that the trial court erroneously applied the law in finding that a valid express contract existed between the parties for construction of the Desselles' new home because the essential terms of the agreement had been reserved for future determination by the parties in that there were no definite plans for the scope of the construction project and there was no agreement as to the contract price.

In reviewing a court-tried civil case such as this, we must affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously applies or declares the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). While we give deference to the trial court's factual determinations, questions of law are reserved for the independent judgment of the appellate court and are reviewed without deference to the circuit court's

determination. *Langdon v. United Rests., Inc.*, 105 S.W.3d 882, 886 (Mo.App. W.D. 2003).

■ "Under Missouri law, the essential elements of a contract are: (1) competency of the parties to contract; (2) subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation." *Bldg. Erection Servs. Co. v. Plastic Sales & Mfg. Co.*, 163 S.W.3d 472, 477 (Mo.App. W.D.2005). At issue here is the fourth element, which requires the parties to have "a mutuality of assent or a meeting of the minds to the essential terms of a contract." *Ketcherside v. McLane*, 118 S.W.3d 631, 635 (Mo.App. S.D.2003).

■ This is critical, because before a court can even begin considering interpreting a contractual agreement, it must first determine whether the agreement constitutes a complete, enforceable contract. *Bldg. Erection Servs.*, 163 S.W.3d at 479. Courts determine whether there has been a meeting of the minds "by looking to the intention of the parties as expressed or manifested in their words or acts." *Gateway Exteriors, Inc. v. Suntide Homes, Inc.*, 882 S.W.2d 275, 279 (Mo.App. E.D. 1994).

The essential terms of the contract must be certain or capable of certain interpretation. That is, the terms of agreement must be sufficiently definite to enable the court to give it an exact meaning. No contract is formed when the terms of agreement are unduly uncertain and indefinite. However, uncertainty and indefiniteness are matters of degree. In determining whether the terms of an agreement are too uncertain to create an

---

**2.** In their brief, the Desselles request that we dismiss Dulin's appeal due to deficiencies in his brief resulting from his claimed failure to comply with Rules 81.12(a) and 84.04(h), arguing that the record on appeal and appendix prepared by Dulin lacks copies of the exhibits

needed to determine the questions presented. As the record before us contains the exhibits about which the Desselles complain and is more than adequate to enable this court to determine those issues, the Desselles' request is denied.

enforceable contract, a court is guided by principles of law applied with common sense and in the light of experience. *Bldg. Erection Servs.*, 163 S.W.3d at 477 (internal citations, quotation marks, and brackets omitted).

■ In particular, the long-recognized general rule in Missouri is that a contract must include a definite price to be binding. *Juengel Constr. Co. v. Mt. Etna, Inc.*, 622 S.W.2d 510, 514 (Mo.App. E.D.1981). Moreover, "[t]here can be no contract so long as the essential terms thereof are reserved for the future determination of both parties." *Brown v. Childers*, 254 S.W.2d 275, 281 (Mo.App. W.D.1953); *see also Gateway Exteriors*, 882 S.W.2d at 279 ("If the parties have reserved the essential terms of the contract for future determination, there can be no valid agreement.")

Although the contract provided that Dulin was to "furnish all labor, materials and equipment required for erection and completion" of the Desselles' new home, the record makes it clear that when the contract was signed on June 12, 2001, the parties had no idea what those expenses would eventually be and employed the phrase "apt. $270,000" to serve as a placeholder for the true contract price, which was unknown and to be determined later.

To begin with, as noted *supra,* although several different sets of blueprints for the Desselles' new home were prepared and submitted to Dulin over the course of the construction project,[3] no architect's or engineer's specifications corresponding to those blueprints were ever submitted to Dulin. Instead, the document that served as the "specifications" for the building project was an itemized breakdown of allowances prepared by State Farm on February 23, 2001, which had nothing to do with either the blueprints or the house shown therein.[4] Accordingly, the parties did not have a clear, certain, and definite contractual agreement as to the specifications for the work to be performed by Dulin.

Nor did they agree on a definite price for that work. In addition to the fact that they set the contract price at "approximately $270,000," which is obviously not a definite figure, Mr. Desselle himself testified that he told Dulin during their negotiations that he planned to make future design changes and "would be working with an architect to flesh out the plans," and often referred to the $270,000 figure as the "budget amount" during his testimony. Mr. Desselle further testified that it was his understanding that his "contract with Mr. Dulin was for $270,000 according to [the] State Farm fire adjustment to rebuild the existing house of 3,371 [square] feet" and that the replacement cost summary he had received from State Farm showed only "what costs they were going to cover as replacement costs from [his] earlier house." However, the record conclusively demonstrates that the Desselles' new home was *not* merely a "rebuild" or "replacement" of the home that had been

---

3. About five days before the contract was signed, the Desselles provided Dulin with a set of preliminary drawings drafted by an architect at TapanAmi Associates, Inc., which were dated May 9 and 10, 2001 and were labeled "Progress Set Incomplete." Thereafter, Dulin was provided with a set of more detailed revisions of the plans previously drafted by TapanAmi Associates, which were dated June 3, June 12, and July 9, 2001 and showed such things as the main floor plan.

Dulin was never furnished with a completed set of construction plans and associated specifications for rebuilding the Desselle residence.

4. As to the State Farm "specifications," Mr. Desselle, who testified that he was an attorney who regularly practiced construction law, stated that although they didn't look like any spec book he had ever seen, "it is what we agreed to."

destroyed by fire, and also contained significantly *more* than 3,371 square feet of interior floor space.

Based on Mr. Desselle's testimony at trial, the Desselles claim that the old house contained 3,371 square feet of interior floor space, while the new house had "a little bit over" 3,700 square feet—an increase of approximately 15%. Although the former figure was contained in the application for a building permit, the underlying basis for the latter estimate was a figure Mr. Desselle claimed Dulin had handwritten at the top of an unidentified document. On the other hand, Dulin testified that the various blueprints he was provided by the Desselles during the construction process were for a home that contained 5,139 square feet of interior floor space—an increase of over 52%. Dulin also introduced into evidence an appraisal the Desselles commissioned in order to obtain a second mortgage on the new home, which showed that, as of June 11, 2002 (less than nine months after the Desselles began occupying the home on November 30, 2001), the new house had 5,139 square feet of interior floor space.[5]

Accordingly, the trial court erred as a matter of law in finding that the parties entered into a complete and binding express contract containing the essential terms of their agreement regarding Dulin's construction of a new home for the Desselles, and all portions of its judgment involving that finding must be reversed and remanded for further proceedings. Point granted.

In his fourth point, Dulin argues that the trial court erred in determining that he was not entitled to recover against the Desselles in *quantum meruit* because that determination was based on the court's erroneous conclusion that they had entered into a valid written construction contract on June 12, 2001. We agree.

Although we need not set them forth in detail, the trial court's erroneous finding that Dulin and the Desselles were parties to a valid and enforceable contract for the construction of the Desselles' new home clearly affected several different aspects of its judgment. Indeed, as the trial court specifically noted in its judgment of September 15, 2004:

Count IV of Dulin's Cross–Claim against the Desselles asserts a *quantum meruit* claim seeking recovery for the reasonable value of labor and materials for which Dulin claims not to have been paid by Desselles.[6] The Court has found that

---

5. The trial court did not definitively resolve this conflicting evidence, some of which was documentary rather than testimonial in nature and did not readily lend itself to a credibility determination, but found only that "there was an increase in the overall living space in the [new] house." Whether that increase was 15% (as claimed by the Desselles) or 52% (as claimed by Dulin), the fact remains that it was significant, and illustrates the parties' divergent understandings of something as basic and vital to the construction project as the blueprints and the size of the new home, further demonstrating that there was no meeting of the minds as to one of the essential terms of the contract.

6. As observed by the Eastern District in *Bellon Wrecking & Salvage Co. v. Rohlfing*, 81 S.W.3d 703 (Mo.App. E.D.2002):

A quantum meruit claim is based upon a legally implied promise that a party will pay reasonable compensation for valuable services or materials provided at the request or with the acquiescence of that party. The principal function of this type of implied contract is the prevention of unjust enrichment, and a claim for quantum meruit does not require the existence of an express agreement between the parties. In cases of quantum meruit recovery, the party viewed as breaching the implied contract is required to return to the injured party the reasonable value of work and labor furnished.

a contract exists between Dulin and Desselles for the construction of the Desselle home, and that the labor and materials for which Dulin seeks payment come within the scope of that Construction Contract, except for the stucco system provided by Cobblestone Construction Finishes, Inc. Therefore the theory of *quantum meruit* is not applicable to Dulin's claims against Desselle.

However, the Court does note that if the Court had not found that a contract exists between Dulin and Desselles, the evidence presented does prove the elements of a claim based upon *quantum meruit* against Desselles for some items. The essential elements of a quasi-contract or *quantum meruit* claim are that the plaintiff provided to the defendant materials or services at the defendant's request or with the acquiescence of the defendant, that the materials or services had reasonable value, and that the defendant, despite the demands of the plaintiff, has failed and refused to pay the reasonable value of such materials or services. *Berra v. Bieg Plumbing Co., Inc.*, 584 S.W.2d 116 (Mo.Ct.App. 1979). However, the amount of damages that Dulin would be entitled to recover from Desselles under a *quantum meruit* theory are quite different than those properly awarded under a breach of contract theory. The Court does not address the issue of what damages would be appropriate under a *quantum meruit* theory in this Judgment because that theory is not the basis of the Court's rulings.

On remand, the trial court and the parties will have an opportunity to revisit this and other issues relating to the various damage awards (or lack thereof) to Dulin and the Desselles for breach of contract, as well as Dulin's indemnity claims against the Des-

selles for sums owed by Dulin to Olathe Millwork Company and Cobblestone Construction Finishes, Inc. Point granted.

As Dulin's first and fourth points have been granted, we need not address his four remaining points, as they are now either moot (*i.e.* Points II and VI, in which Dulin argues that the Desselles waived the contractual provisions regarding change orders and that the plans for the new home were not substantially similar to those for the old one), or can be adequately readdressed on remand (*i.e.* Points III and V, which concern Dulin's claims against the Desselles for indemnification and for action on an open account).

As the trial court erred as a matter of law in finding that Dulin and the Desselles entered into a complete and binding express contract containing the essential terms of their agreement to have Dulin build a new home for the Desselles, all portions of its judgment involving that finding are reversed and remanded for further proceedings not inconsistent with this opinion. The remaining parts of the judgment are affirmed. On remand, the trial court is directed to enter a new judgment awarding the proper sum of damages to Dulin and the Desselles under the theories of recovery pled by the parties and supported by the evidence presented at trial.

All concur.

*Id.* at 711 (internal citations omitted).